## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

No. 5:12-CR-15-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| MARK DAVIS and LAWANDA | ) | MEMORANDUM AND |
| RAGLAND, | ) | RECOMMENDATION |
| | ) | |
| Defendants. | ) | |

This matter is before the court on the Joint Motion to Suppress [DE-36] filed by

Defendants Mark Davis and Lawanda Ragland ("Defendants"). The motion was referred to this

court and is considered here as a recommendation to the District Court. *See* 28 U.S.C. §

636(b)(1)(B); FED. R. CRIM. P. 59(b)(1). The government has responded [DE-44] to the motion

and the court held a hearing to further develop the record. The parties have subsequently

submitted post-hearing briefing. Accordingly, the motion is ripe for review. For the reasons

stated below, it is the recommendation of this court that Defendants' motion be denied in part,

allowed in part.

## BACKGROUND

On January 18, 2012, a Grand Jury sitting in the Eastern District of North Carolina

returned a fourteen-count indictment against Defendants Davis and Ragland. [DE-10].

Defendants were charged with conspiracy in violation of 18 U.S.C. § 371 (Count 1), access

device fraud in violation of 18 U.S.C. §§ 1029(a)(3) & 2 (Count 2), aggravated identity theft and

aiding and abetting in violation of 18 U.S.C. §§ 1028A & 2 (Count 3), and possession of stolen

mail in violation of 18 U.S.C. §§ 1708 & 2 (Counts 4-14). Defendants' arraignment in this

matter has been held in abeyance pending a ruling on Defendants' motion to suppress and for a

*Franks* hearing. [DE-42].

According to Defendants' motion and supporting memorandum, the indictment arose out of the execution of a search warrant at 217 Sarah Lane, located in Vance County, North Carolina by officers of the Henderson Police Department ("HPD"). Defs.' Joint Mot. to Suppress & for a *Franks* Hr'g ("Defs.' Mot.") ¶ 2 [DE-36]; Defs.' Mem. of Law in Supp. of Mot. to Suppress & for a *Franks* Hr'g ("Defs.' Mem.") at 1 [DE-37]. The search warrant purported to seek the recovery of property rented from Crusader Rent-to-Own ("Crusader") located in Henderson, North Carolina. Defs.' Mot. ¶ 2; Defs.' Mem. at 5-8. Defendants contend the search warrant application is "rife with false statements and misleading omissions, which are indispensable to the finding of probable cause." Defs.' Mot. ¶ 5. Defendants contend that suppression of the evidence is required in accordance with *Franks v. Delaware*, 438 U.S. 154 (1978). *Id.* ¶ 6. Alternatively, Defendants contend that if the search warrant survives a *Franks* inquiry, suppression of the evidence is nonetheless required based on numerous Fourth Amendment violations present in the warrant and its execution. Defs.' Mot. ¶ 7; Joint Mem. of Law in Supp. of Suppression of Evid. ("Defs.' Supp. Mem.") [DE-87]. Defendants have moved further to suppress all evidence seized pursuant to a federal search warrant issued December 18, 2009 on the grounds that the federal search warrant relies entirely on false information from the HPD and evidence illegally obtained during the search of 217 Sarah Lane. Defs.' Mot. ¶ 9.[1]

On May 15, 2012, the government responded to Defendants' motion and did not oppose Defendants' request for a *Franks* hearing. United States's Resp. to Defs.' Mot. ("Gov't's Resp.")

---

[1]     The federal search warrant has not been presented to this court nor has there been an identification of the particular information on which the federal search warrant relies. Moreover, Defendants' briefing does not address suppression with regard to a federal search warrant.

[DE-44]. Accordingly, Defendants' motion for a *Franks* hearing was allowed [DE-49] and on June 27, 2012, this court held a *Franks*/Suppression hearing. [DE-68]. At the hearing, Defendants presented the testimony of Lee Harrell and Michael D. Waters and the government presented the testimony of John H. Zollicoffer, Jr., Sergeant Durwood Campbell of the Vance County Sheriff's Office and Lieutenants Steven Vaughn and Christopher Ball of the HPD. [DE-76].

Following the hearing, the government submitted additional briefing. *See* United States's Supp. Resp. in Opp'n to Defs.' Mot. to Suppress ("Gov't's Supp. Resp.") [DE-71, 73]. Defendants moved alternatively to strike the government's supplemental briefing or to be permitted to submit additional briefing of their own. [DE-72]. The court permitted Defendants additional time to submit their own post-hearing briefing and Defendants have filed a timely supplemental brief. *See* Defs.' Supp. Mem. [DE-87].

## STATEMENT OF FACTS

### The Search Warrant Authorizing the Search of 217 Sarah Lane

The search warrant was issued in the Matter of Robert Hicks Jr., 217 Sarah Lane Henderson, North Carolina on May 14, 2008 at 11:52 a.m by North Carolina Magistrate Terry. Def. Hr'g. Ex. F; Gov't Hr'g. Exs. 27-34. Detective CD Ball, now Lieutenant Ball ("Ball"), of the HPD provided a sworn affidavit in support of the application for the search warrant.

In relevant part, the search warrant affidavit provides the following information from Ball:

**Section 2     Person or Property to be Seized**

...latent prints; Crosley Washer (SN: XC74310646); Crosley Dryer (SN:

3

XD74311353); documentation related to the control of 217 Sarah Lane; documents related to fraudulent activities; photographs; any other stolen property; any and all evidence that may relate to the possession of stolen property from Crusader Rent to Own, 120 Raleigh Rd Henderson, NC, which constitutes evidence of the crime of Possession of Stolen Property and Obtain Property by False Pretense, which in violation of N.C.G.S. 14-71.1 and N.C.G.S. 14-100, and the identity of the person, or persons, participating in this crime, or crimes. This property or evidence will be located at ...

## Section 3    Location to be Searched

Premises

...217 Sarah Lane Henderson, North Carolina and its curtilage. Residence will be the last double-wide trailer on the left. Double-wide will be white in color. A green Mercedes, a silver car, and a Tahoe will be in the yard. A pit-bull will also be in the yard.

. . .

## Section 4    Facts to Establish Probable Cause

The applicant swears to the following facts to establish probable cause for the issuance of a search warrant:

On 05/14/08, Manager Lee Harrell with Crusader, stated that he has been to 217 Sarah Lane on 05/13/08 and has located the Crosley Washer (SN:XC74310646) and Crosley Dryer (SN:XD74311353) that was rented from his store. He stated that he looked at the serial numbers on the items and verified them to be from his store.

On 5/14/08, Manager Lee Harrell, stated that a Robert Hicks of 2073 Julia Ave had obtained the property. Manager stated that he checked the listed employer, 1001 Home Improvement of 455 Brookwood Lane, to be a fraudulent business [sic]. Manager stated the location listed was a trailer park. He stated that he further determined that the location of 2073 Julia Ave where the property was delivered was not Mr. Robert Hicks residence. Manager stated that he followed up on the references listed on the application and located the washer and dryer at 217 Sarah Lane. Application lists Wanda Ragland as being the resident.

Manager also stated that Mr. Hicks has obtained property from other rental businesses in the Henderson area.

05/14/08, Manager stated that while checking inside 217 Sarah Lane for the washer

4

and dryer he observed nine big screen televisions, four Xbox 360s, and two computers in every room. Manager stated based on his experiences he believed the items to be stolen.

**Section 5    Closing Statement**

Based on the fact the stolen items from Crusader's was seen by the manager on 05/13/08 inside the residence of 217 Sarah Lane, and the serial numbers were verified by the manager to be from the store, I believe the items listed in this application will be located at 217 Sarah Lane.

Based on the fact that the washer and dryer were obtained by fraudulently [sic] means I believe other items from different business [sic] may have been obtained in the same manner. Based on my training and experience I believe the other items that the manager saw inside the residence to be stolen or fraudulently obtained.

Based on my training and experience where stolen items are located numerous other stolen items are also located.

Based on the fact that numerous persons were listed on the application for the rental of the washer and dryer, I believe other individuals are involved along with Robert Hicks. I believe that information identifying these individuals or other fraudulent documentation will be located at 217 Sarah Lane.

Based on my training, knowledge, and experience, along with the above facts, I believe, I will find the items listed in this application, and that they will be located at the place, or places specified above. I request the court issue a warrant to search the location, or locations in this application.

Def. Hr'g Ex. F; Gov't Hr'g Exs. 30-32.

The search warrant inventory, signed by Ball on May 16, 2008, indicates an item

identified as LG 42" TV SN:MXWE07433 was seized pursuant to the search of 217 Sarah Lane.

Def. Hr'g Ex. F; Gov't Hr'g Exs. 33-34. The inventory indicates further that law enforcement

will hold the seized property subject to a court order. Def. Hr'g Ex. F; Gov't Hr'g Ex. 34.

The Henderson City Charter

The HPD has taken the position that based upon the city charter, the police have the

5

authority to execute search warrants outside the Henderson city limits. Hr'g Tr. pp. 28, 254-55.

The Charter for the City of Henderson in effect at the time of the search warrant provides the

following:

> The members of the police department and the chief of the department shall have all the powers and authority now, or which may hereafter be vested in sheriffs and constables for the preservation of peace of the city and for suppressing disturbances and arresting offenders, which authority of the police department shall not be confined to the corporate limits of the city, but may be exercised anywhere in Vance County.

Hr'g Tr. pp. 17-18; Gov't Exs. 63, 64. In 1958, the Attorney General of the State of North

Carolina issued a formal opinion letter on the authority of the HPD in Vance County, wherein the

Attorney General took the position that the city charter provision allowing the police

extraterritorial jurisdiction does not extend to the execution of search warrants outside the city

limits.[2] Hr'g Tr. pp. 24-26; Def. Hr'g Ex. J. The city attorney, however, contends the charter

permits the execution of search warrants by Henderson police outside the city limits, while

certain attorneys practicing in the local courts of Vance County disagree. Hr'g Tr. pp. 20, 254-

55. No opinions have been issued subsequently by the North Carolina Attorney General nor has

this issue been resolved by a court ruling. Hr'g Tr. pp. 27, 28-29, 256, 258-59.

Testimony of Sergeant Durwood Campbell

Sergeant Durwood Campbell ("Campbell"), a Deputy Sheriff of the Vance County

Sheriff's office, testified that on May 13, 2008, a gentleman[3] from Crusader, identified as Lee

---

[2]    Revisions to the city charter in 1967-68 are not material to the discussion here. Hr'g Tr. pp. 16, 23.

[3]    Campbell testified that he recognized the gentlemen from Crusader in a photograph which was provided to Campbell during his examination by the prosecution. Hr'g Tr. pp. 38-39. The

6

Harrell ("Harrell"), entered the Sheriff's office and requested an escort to a house in order to

search for some property. Hr'g Tr. pp. 34-35. At approximately 2 p.m. on May 13, 2008,

Campbell provided the escort to 217 Sarah Lane driving in his own patrol car while Harrell drove

to the residence in another vehicle.[4] Campbell testified that his responsibility in providing an

escort was to ensure Harrell's safety, but that he would need a court order to assist Harrell in

retrieving any property. Hr'g Tr. pp. 35, 41. When they arrived at the residence, Harrell knocked

on the door and an older African-American male answered. The African-American male told

Harrell that there was a washer and dryer in the house and Campbell stated that Harrell may have

entered the house to see if the washer was the property for which he was searching. Hr'g Tr. pp.

41-42. Campbell did not enter the house and does not know what Harrell saw while he was

inside the house. Hr'g Tr. pp. 42-43. The entire encounter lasted approximately twenty-five

minutes. Hr'g Tr. p. 38.

Testimony of Lieutenant Steven Vaughn

Lieutenant Vaughn ("Vaughn") testified that he received information to contact Harrell at

Crusader regarding the retrieval of a washer and dryer from 217 Sarah Lane. Hr'g Tr. p. 45.

Vaughn met with Harrell at Crusader on the evening of May 13, 2008 between 6:30 p.m. and 7

p.m. Hr'g Tr. pp. 44-45. Harrell told Vaughn that he wanted the police to go to 217 Sarah Lane

---

prosecution subsequently moved the photograph into evidence as a photograph of Lee Harrell
without objection from Defendants. Hr'g Tr. pp. 46, 340-41.

[4]     Campbell's Call Detail Report, which records a deputy's use of a patrol car, indicates
Campbell provided an escort to 219 Sarah Lane. Gov't Hr'g Ex. 65; Hr'g Tr. p. 39. Campbell
testified he provided the only sheriff's escort to the residence on May 13, 2008, and that no similar
escort was provided on May 14, 2008. Hr'g Tr. pp. 36-37. Campbell testified he believes the
address was reported erroneously on the Call Detail Report because he does not believe there is a
residence located at 219 Sarah Lane.

to retrieve a washer and dryer. Hr'g Tr. p. 47. Vaughn explained that the recovery of rental property is a civil matter not involving the police, and that Harrell should contact the Vance County Sheriff's office and obtain a writ from a court to recover the property. Hr'g Tr. pp. 47, 51, 53, 55-56. After Vaughn told Harrell that the police could not assist him, Harrell then told Vaughn that the police should probably go to 217 Sarah Lane because Harrell had seen a large number of electronics, televisions, play stations, Xboxes and computers in the house which was stolen property. Hr'g Tr. p. 48. Vaughn told Harrell to contact the sheriff's office for assistance in recovering his property and that he would pass along the information regarding the stolen property to other officers. Hr'g Tr. p. 55.

### Testimony of Lieutenant Christopher Ball [5]

Ball is currently assigned to the Special Operations Division of the HPD. In 2008, Ball was a detective with the HPD and in that capacity he was assigned primarily to investigate fraud cases and was the lead investigator assigned to this case. Hr'g Tr. pp. 57-59.

On May 14, 2008, at roll call briefing, Vaughn advised that there was rental property from Crusader located at 217 Sarah Lane and Ball was assigned to speak to with Harrell. Hr'g Tr. p. 63. At approximately 10 a.m., Ball and Detective Jackson met with Harrell at Crusader. In their meeting, Harrell explained that Crusader had delivered a washer and dryer and two televisions to Robert Hicks at 2073 Julia Avenue and that these items had been subsequently moved to 217 Sarah Lane. Hr'g Tr. p. 64.

---

[5]     Much of Ball's testimony as to certain events is based upon his review of the notes he made contemporaneously with events or reports regarding the search of the residence at 217 Sarah Lane and his conversation with Lee Harrell, which are part of the hearing record. *See* Hr'g Tr. p. 60; Gov't Hr'g Exs. 35-38.

Harrell provided Ball with documentation from an investigation that Harrell had conducted regarding the rental of these items by Hicks. Hr'g Tr. p. 64. These documents included the rental application completed by Hicks which contained the name and address of Hicks' business or employer, as well as several individuals listed as references. Harrell informed Ball that he had attempted to verify the information listed in these documents, and determined the listed business was fictitious because the address corresponding to the business was located in a trailer park. Hr'g Tr. pp. 74, 108-09. In addition, according to Ball, Harrell was not able to confirm an individual named Ann Williams who was listed as a reference, and thus Harrell thought this person was fictitious. Hr'g Tr. p. 108. Harrell also called at least one other reference on the rental application and could not verify the individual named. Harrell also told Ball that the address Hicks had provided as his home address and where the property had been delivered was inaccurate. Hr'g Tr. p. 74. Harrell also told Ball that Hicks had rented property from other rental companies and Harrell provided Ball with documents from another rental company advising against renting to Hicks. Hr'g Tr. pp. 64, 74.

Harrell told Ball further that he had gone to 217 Sarah Lane the previous day, May 13, 2008, with a Vance County Deputy Sheriff. Hr'g Tr. pp. 63, 73, 98. Although the owners were not at the residence at the time, an older African-American male allowed Harrell to enter the house wherein Harrell verified by serial number the rented washer and dryer from Crusader. Hr'g Tr. pp. 64-65, 73. Harrell also told Ball that he was suspicious that other property he saw in the home was stolen. Hr'g Tr. pp. 65, 73. According to Ball, Harrell said there were nine large-screen televisions in the house along with four X-boxes and two computers. Hr'g Tr. pp. 65, 75. Harrell said, based on his experience, he believed the other merchandise he saw was

9

"fraudulently obtained stolen." Hr'g Tr. pp. 67, 75. Harrell told Ball that he believed these items were stolen because Harrell thought it was odd that there would be that many televisions in a house of that particular size, a modest residence.[6] Hr'g Tr. pp. 67-68. Based on Harrell having performed his own investigation and his being "involved in the [rental] industry in tracking down rental property," Ball believed Harrell "to be reliable in knowing what was fraudulent and what [was] not fraudulent." Hr'g Tr. p. 112.

Ball informed Harrell that he would apply for a search warrant to search the residence for stolen property and advised Harrell not to interfere with the investigation. Hr'g Tr. pp. 68, 120. During their meeting, Harrell did not say anything to Ball about having permission to retrieve the property from the residence, nor did Harrell inform Ball that he was in fact going to retrieve the washer and dryer himself. Hr'g Tr. pp. 120, 161. After meeting with Harrell, Ball began drafting the search warrant application. Hr'g Tr. pp. 68-69. Ball wrote a report and search warrant application based on his notes from his conversation with Harrell. Hr'g Tr. pp. 112-13. Ball relied on what he learned from Harrell and performed no further investigation. Hr'g Tr. pp. 100, 123-24, 133-34.

Shortly before noon on May 14, 2008, Ball went to the magistrate's office located in Henderson after having drafted the search warrant application. Hr'g Tr. p. 93. The magistrate did not inquire of Ball whether the proposed search was to be performed outside the Henderson city limits. Hr'g Tr. p. 71. Ball is not certain of the distance between 217 Sarah Lane and the Henderson city limits, but stated it is "[b]etween less than two miles." Hr'g Tr. p. 69.

---

[6] The home was described as a one-story double-wide trailer or modular home. Hr'g Tr. pp. 102-03.

10

After the magistrate issued the search warrant, Ball returned to the police department to assemble and prepare the search team. Hr'g Tr. p. 75. The police executed the search warrant at approximately 12:40 p.m. on May 14, 2008. Hr'g Tr. p. 84. Upon the arrival of law enforcement at 217 Sarah Lane, Ball was delayed exiting the vehicle in which he was riding, and by the time he had reached the front door of the residence, other officers had entered the residence leaving the door open. Hr'g Tr. p. 76.

As Ball entered the residence, he noticed Lawanda and Regina Ragland were in the front room of the house. Hr'g Tr. p. 78. Ball reviewed the search warrant with Lawanda Ragland. Hr'g Tr. pp. 149, 156-57. As he was explaining the search warrant to Lawanda Ragland, she told him that the rental company had already been to the house, approximately five minutes before law enforcement arrived. Hr'g Tr. pp. 86-87, 149-50.

While Ball was in the front room of the residence, officers called for Mark Davis who eventually emerged from a back bedroom. After Davis entered the front room, law enforcement searched the back bedroom. Ball subsequently noticed that a washer and dryer appeared to have been recently removed from the kitchen area of the house. Hr'g Tr. p. 79. He also noticed that the back door to the house was open and he saw a truck with a refrigerator on it. About that time officers alerted Ball to the back bedroom. Hr'g Tr. p. 77.

The officers searching the back bedroom located a television beside the bed covered by a blanket, which later turned out to belong to Crusader. Hr'g Tr. pp. 80, 86. The officers also located a second television, along with a PlayStation 3, a computer and a scanner in the

11

bedroom.[7] Hr'g Tr. p. 80. Located on the inside bed of the scanner was a piece of paper
containing a signature of someone other than either Defendant. Hr'g Tr. pp. 80-81. The officers
also found blank checks and checks containing writing on the bed. Hr'g Tr. p. 81. Credit cards
with other persons' names, checks and prepaid cards were found in an open Shoe Show shopping
bag on the bed. Hr'g Tr. pp. 81, 147, 148. On a chair in the bedroom the police found a laundry
basket containing papers piled to the top of the basket. Hr'g Tr. p. 81. Upon closer inspection,
these documents were discovered to be mail, people's identities, social security numbers and
credit cards. Hr'g Tr. p. 81. The mail contained the names of persons other than Defendants.
Hr'g Tr. pp. 93, 145. In the closet police found a filing cabinet containing documents, folders
and notebooks containing people's identities. Hr'g Tr. p. 82.[8] A computer was found in the
bedroom along with mail addressed to both Defendants. Hr'g Tr. p. 82. A briefcase was
discovered in the hallway. Hr'g Tr. p. 84. After Davis provided his consent to search the
briefcase, officers opened the briefcase and discovered tax records containing the names of other
individuals. Hr'g Tr. pp. 84-85. Finally, in the back of the closet, officers discovered a .22
caliber rifle and a box of 9mm ammunition. Hr'g Tr. pp. 82-83. Upon discovery of the firearm
and ammunition, Ball contacted the police department and after learning that Davis had a prior
felony conviction, Ball arrested Davis at the scene. Hr'g Tr. pp. 82-83.

In the course of the search of 217 Sarah Lane, the television belonging to Crusader was

---

[7] Ball saw Xboxes in the residence but did not specify their number or location, nor did he
testify that they were reported stolen. Hr'g Tr. p. 83. The officers traced the serial numbers of all
of the electronic equipment discovered in the home, with the exception of the television belonging
to Crusader, and learned that none of the property was reported as stolen. Hr'g Tr. pp. 83-84.

[8] Ball is uncertain whether the closet door was open or closed. Hr'g Tr. p. 163.

removed and placed on the front porch. Hr'g Tr. pp. 86, 124. Someone from the police department contacted Harrell regarding the television, and Harrell subsequently returned to 217 Sarah Lane and retrieved it while the police were still at the residence. Hr'g Tr. p. 124.

Ball interviewed Davis at the police station, advising him in advance of his Miranda rights. Hr'g Tr. p. 89. Davis agreed to speak to officers and indicated that some of the businesses identified in the documents seized during the search were his former businesses or those of Robert Hicks or other persons. Hr'g Tr. pp. 90-91. Davis also stated that the visa credit cards were prepaid cards and that the checks were payroll checks associated with his businesses. Hr'g Tr. pp. 91-92. Davis stated further that Robert Hicks had moved the washer and dryer to 217 Sarah Lane one month earlier, after having been kicked out of the house in which he was residing by his uncle. Hr'g Tr. p. 91.

Ball did not know that prior to the execution of the search warrant the washer and dryer belonging to Crusader had been removed from the residence. Hr'g Tr. p. 94. Ball testified further that based on the information provided by Harrell, he believed that the crimes of possessing stolen goods and obtaining property by false pretenses had been committed. Hr'g Tr. p. 99. According to Ball, the evidence of obtaining property by false pretenses consisted of the misrepresentations of fact made by Hicks and contained in the rental application, whereas the evidence of possession of stolen goods was based on Harrell's statements regarding the property he saw in the residence. Hr'g Tr. pp. 99, 109, 112-13. According to Ball, Harrell appeared to be a reliable source of information because Harrell provided law enforcement his name, birth date and place of business. Hr'g Tr. p. 100. Moreover, Harrell had been involved in the rental business and appeared to be an "expert" in his field. Hr'g Tr. pp. 100, 112, 114, 142. Harrell

13

told Ball further that he had identified the serial numbers of the Crusader washer and dryer and that he thought it was uncommon that there would be other rented televisions and gaming devices in the residence. Hr'g Tr. pp. 100-101. However, Harrell did not tell Ball that he had identified the property in the residence as being other rental property, nor did Ball have independent information that any of the other property was either rented or stolen. Hr'g Tr. p. 101.

Ball testified further that on Hicks' rental application, Hicks had identified Lawanda Ragland as a personal reference indicating her address as being on 217 Sarah Lane, along with a telephone number. Ball did not contact the references on the application because Harrell had indicated that he had attempted to verify information in the application and received conflicting information.[9] Hr'g Tr. pp. 105-06. Ball did not attempt to follow up with the Vance County Sheriff's office prior to the search. Hr'g Tr. p. 98. Rather, based on Harrell being in the rental business, having tracked down property previously and having conducted an investigation in which he had received conflicting information about a renter who had moved rented property, Ball considered Harrell to be reliable. Hr'g Tr. pp. 112, 142. Harrell did not tell Ball prior to the search whether he had called Lawanda Ragland. Hr'g Tr. pp. 105, 112.

In drafting the search warrant, Ball relied on the information Harrell provided him and notes Ball made of his interview with Harrell. Hr'g Tr. pp. 119, 123-24, 133-34. Ball was suspicious since Harrell was unable to corroborate the rental application information through his own investigation. Hr'g Tr. p. 106. Based on his training and experience, his review of his notes

---

[9]     According to Ball, Harrell tried to verify individuals but did not think they were the ones listed. The basis for this belief was not explained. Hr'g Tr. pp. 107, 108.

14

and the information provided by Harrell, including the fact that several people were listed on the rental application, Ball surmised that where one individual is involved in identity theft or obtaining property by false pretenses, there are usually others. Hr'g Tr. pp. 107-08. According to Ball, the police were seeking any evidence of fraudulent activity based on Harrell's investigation, including Crusader's property and other property including fraudulent documents. Hr'g Tr. pp. 100, 133.

The police seized 369 items as part of their search of 217 Sarah Lane. Hr'g Tr. pp. 60; Gov't Hr'g Exs. 1-23, 33-34. The items seized included allegedly-stolen or fraudulent mail, debit cards, checkbooks, a printer, computers, financial documentation and other documentation, a rifle and ammunition. Hr'g Tr. pp. 84, 144; Gov't Hr'g Exs. 1-23, 33. One of the items listed in the inventory of items seized is a television belonging to Crusader. Hr'g Tr. pp. 125, 143; Gov't Hr'g Ex. 33. Other than Crusader's television, no other rental or reportedly-stolen property was seized. Hr'g Tr. p. 147. The search warrant inventory, signed and verified by Ball, states that law enforcement would "hold the seized property subject to court order." Hr'g Tr. p. 126; Gov't's Ex. 34. However, Ball admits returning the television to Harrell without a court order. Hr'g Tr. pp. 126-27.

### Testimony of Lee Harrell

Harrell was the manager at Crusader during the events in question. In February 2008, Robert Hicks rented a washer, dryer and television from Crusader.[10] Hr'g Tr. pp. 174-75. As part of the rental, Hicks completed an application requiring him to provide information regarding his residence, employment and the names of several references. Hr'g Tr. p. 174-76. The items

---

[10]     Hicks rented a second television from Crusader in March 2008. Hr'g Tr. p. 177.

rented by Hicks were delivered to 2073 Julia Avenue, his reported residence. Hr'g Tr. p. 175. The rental agreement provided that the washer, dryer and televisions were not permitted to be removed from the residence without prior permission from Crusader. Hr'g Tr. p. 175. Hicks stopped paying rent on the items in or about March 2008, whereupon Crusader began to investigate the whereabouts of its property. Hr'g Tr. p. 176. A representative from Crusader attempted to locate Hicks' employer from the information provided on the application but instead found only a vacant lot. Hr'g Tr. p. 176. An account manager from Crusader went to Hicks' residence to retrieve the property but found the property missing. Hr'g Tr. pp. 176-77. Around April 2008, Crusader filed a civil complaint in small claims court against Hicks for failing to return rental property. Hr'g Tr. pp. 178-79.

About this time, Harrell began his own investigation by attempting to contact the references listed on Hicks' rental application. Hr'g Tr. pp. 179-80. Harrell spoke with Regina Ragland and explained to her that someone had told him that she could contact Lawanda Ragland, whom Harrell understood had possession of Crusader's property. Hr'g Tr. p. 180. Regina Ragland told Harrell that she would have Lawanda Ragland return his call. Hr'g Tr. p. 180. Harrell also testified that he had received a tip from a Crusader customer that the washer and dryer were located at 217 Sarah Lane.[11] Hr'g Tr. pp. 209-10.

Lawanda Ragland subsequently called Harrell to tell him the washer and dryer belonging to Crusader were located at 217 Sarah Lane and that she would call him the following morning to

---

[11]     The entirety of Harrell's testimony regarding the events of May 13 and 14, 2008 is based upon his recollection. Harrell did not make any notes contemporaneous to the events about which he testifies. He testified further that his memory is not "crystal clear" and he is not certain of the particular dates of events. Hr'g Tr. pp. 193, 195, 228.

16

tell him when he could come get them. Hr'g Tr. pp. 181-82. Lawanda Ragland told Harrell further that an African-American man would be at the house to allow him to enter the residence. Hr'g Tr. p. 182.

After Harrell's conversation with Lawanda, two HPD officers visited the Crusader office. Hr'g Tr. p. 182. Harrell, however, had not called the HPD.[12] Hr'g Tr. p. 182. The police asked for information concerning Robert Hicks. Hr'g Tr. p. 183. Harrell told the officers of his conversation with Lawanda Ragland and that she would call the next day to let him know that he could pick up Crusader's property. Hr'g Tr. pp. 183, 199. Harrell did not ask the officers for any assistance in the return of Crusader's property and told them that he was going to 217 Sarah Lane to retrieve the property himself. Hr'g Tr. pp. 183, 192-93, 200. The police told Harrell not to go to 217 Sarah Lane because the police were planning to raid the house. Hr'g Tr. pp. 190, 200.

The following morning, Lawanda Ragland called Harrell and told him that he could retrieve the washer and dryer from 217 Sarah Lane.[13] Hr'g Tr. p. 183. Harrell testified that he then went to 217 Sarah Lane with a Vance County Sheriff's Deputy, whose name he could not recall, and Calvin, a Crusader account manager.[14] Hr'g Tr. pp. 183-84, 200, 216-17, 229-30.

Harrell arrived at 217 Sarah Lane and after knocking on the door, was allowed to enter the residence by an African-American male. Hr'g Tr. p. 184. The African-American male

---

[12] Harrell does not recall having a conversation with Vaughn on May 13, 2008 asking the HPD to assist in retrieving the property. Hr'g Tr. pp. 227-28. Harrell believes that Ball was one of the officers who visited Crusader, but admits he cannot recall the names of the officers. Hr'g Tr. p. 182.

[13] Harrell identified this date, to the best of his recollection, as May 14, 2008. Hr'g Tr. p. 193.

[14] Harrell testified he does not recall contacting Vance County Sheriff Deputy Campbell on May 13, 2008, but that Campbell's testimony as to the sequence of events may be correct. Hr'g Tr. p. 225.

17

showed Harrell and the Vance County Sheriff's Deputy where the washer and dryer were located and Harrell verified them as Crusader property. Hr'g Tr. pp. 184-85. According to Harrell, he and the deputy then looked around the residence to see if any other Crusader merchandise was in the home. Hr'g Tr. pp. 184-85, 216. Harrell testified that out of professional courtesy he looked to see if property from other rental agencies was located in the residence. Hr'g Tr. pp. 184, 188-90. Specifically, he looked at the back of televisions to verify serial numbers and ownership tags or other verifying markings. Hr'g Tr. pp. 184, 233. Harrell and the deputy entered every room as they searched the house, under beds and in the attic. Hr'g Tr. pp. 185-86. While Harrell saw eight to nine televisions in the house, he did not identify any televisions belonging to Crusader. Hr'g Tr. pp. 218-19. Harrell does not recall seeing any computers, scanners, gaming systems, checks, social security or other financial documents or any fraudulent documents during his search of the house. Hr'g Tr. pp. 212-14. Harrell then took possession of the washer and dryer and returned them to the store between approximately 10:30 a.m. and 11 a.m., when the unit was cleaned and placed back on the rental floor. Hr'g Tr. pp. 186-87. Harrell believes he was at 217 Sarah Lane for 30-45 minutes. Hr'g Tr. p. 183.

After Harrell had retrieved the washer and dryer and returned to the store, officers from the HPD arrived at Crusader. Hr'g Tr. p. 187. Harrell told the officers that he had been to 217 Sarah Lane and had retrieved the washer and dryer, but that the televisions belonging to Crusader were not in the residence. Hr'g Tr. pp. 186-87, 190, 201. He told the police there were a few other televisions in the house but did not tell them a specific number of televisions. Hr'g Tr. p. 188. Harrell did not tell the police he saw any computers or gaming systems in the house. Hr'g Tr. p. 188. Harrell never told the HPD there was stolen property inside 217 Sarah Lane or that he

18

believed there to be fraudulent documents inside as well. Hr'g Tr. pp. 195, 198, 231-32. Harrell never told the police he saw nine big screen televisions, four Xboxes, or two computers, nor did he tell the police he believed the house contained stolen merchandise. Hr'g Tr. p. 198.

Later that day Harrell received a call from the HPD to pick up his television at 217 Sarah Lane. Hr'g Tr. p. 201. Harrell drove to Sarah Lane later that afternoon to pick up the television around the time the police were searching the house. Hr'g Tr. p. 191. When Harrell arrived and stepped out of his car, an officer whom Harrell believes to be Ball grabbed his arm and advised him he could be charged with obstruction of justice. Hr'g Tr. p. 191. Harrell retrieved the television, placed it in the back of the truck and returned to Crusader. Hr'g Tr. p. 192.

Harrell had previously gone to 217 Sarah Lane on one other occasion with the account manager from Crusader, but no one was home at the time. Hr'g Tr. p. 198. Finally, Harrell said that while working for Crusader, there were other occasions when he had been accompanied by a sheriff's deputy to a residence to locate rental property belonging to Crusader. Hr'g Tr. p. 243.

Testimony of Michael D. Waters

Mr. Waters represented Defendant Davis in regards to charges filed in state court against Davis arising out of the search of 217 Sarah Lane and Waters was retained shortly after the execution of the search warrant.[15] Hr'g Tr. pp. 261-62; Gov't Hr'g Exs. 69-71. In this capacity, Waters called Harrell on May 16, 2008, regarding the circumstances of the search. Hr'g Tr. p. 262. To the best of Waters' recollection, Harrell told Waters that someone had called Harrell and told him where the washer and dryer belonging to Crusader were located, and that Harrell subsequently went to the residence with a sheriff's deputy. Hr'g Tr. p. 263. Harrell told Waters

---

[15]     These charges were dismissed on June 25, 2012. Hr'g Tr. p. 262; Gov't Hr'g Exs. 69-71.

that Ms. Ragland had called Harrell and permitted him to retrieve the property. Hr'g Tr. p. 263. Harrell told Waters further that Harrell went to the residence the following day, loaded the washer and dryer and was departing the residence when law enforcement arrived at the residence.[16] Hr'g Tr. pp. 263-64; 286. It was Waters' impression from his conversation with Harrell that the police saw the washer and dryer in Harrell's truck. Hr'g Tr. p. 290.[17]

According to Waters, Harrell said that he had not requested police assistance. Hr'g Tr. p. 264. Instead, the police went to Crusader and asked for a copy of the rental file and said the police were investigating someone else.[18] Hr'g Tr. p. 264. According to Waters, Harrell indicated that he told the police he was simply trying to retrieve Crusader's property and that if he had the opportunity to get the property back, he would do so. Hr'g Tr. p. 264. Harrell told Waters further that the police had admonished him not to go to the residence but that he told the police it was his responsibility to retrieve Crusader's property. Hr'g Tr. p. 264.

Waters testified that Harrell sounded upset during their conversation and that he seemed mad because the police had threatened him with obstruction of justice. Hr'g Tr. p. 265. He said the police were mad at him because he was not supposed to be at the residence removing property. Hr'g Tr. p. 286.

---

[16]     Harrell claims that after he returned to Crusader with the washer and dryer, and before officers had executed the search warrant, officers arrived at Crusader. Harrell claims he informed the officers then that he had already repossessed the washer and dryer. Harrell Aff. [DE-37.1] ¶¶ 32-33.

[17]     There was no testimony that the police in fact saw Harrell or the washer and dryer at any time during the execution of the search warrant.

[18]     According to Harrell's affidavit, however, Harrell "did not discuss [his] business file regarding Robert Hicks with Henderson Police at any time." Harrell Aff. [DE-37.1] ¶ 52.

20

## DISCUSSION

Defendants move for blanket suppression of the evidence on multiple grounds. First, Defendants move for the suppression of the evidence seized in the search of 217 Sarah Lane on the grounds that suppression is required under *Franks v. Delaware*. Specifically, Defendants contend the evidence shows the search warrant affidavit contains materially false information made deliberately and recklessly and that the search warrant lacks probable cause absent the false information. Defs.' Supp. Mem. at 1-7. Alternatively, Defendants argue blanket suppression is required because the facts stated in the search warrant application are insufficient to support the magistrate's finding of probable cause and the search warrant is not valid under the good faith exception. Defs.' Mot. ¶ 7; Defs.' Supp. Mem. at 7-11, 16-18. Next, Defendants argue the warrant lacks particularity. Defs.' Mot. ¶ 7; Defs.' Supp. Mem. at 12-14. Finally, Defendants argue the police exceeded the scope of the search warrant. Defs.' Supp. Mem. at 12-14. The government contends the warrant was supported by probable cause and that regardless, the seizures were permissible under the "plain view" doctrine. Gov't's Supp. Resp. at 3-4.

The parties' contentions thus present these questions for the court: (1) whether the warrant is invalid because it was obtained with intentional false information; (2) whether the warrant was supported by probable cause, and if not, whether it is still valid pursuant to the good faith exception; (3) whether the warrant is invalid for lack of particularity; and (4) whether the execution of the warrant exceeded the scope of the warrant such that blanket suppression is required. The court addresses these in order.

A.    *Franks*

In *Franks v. Delaware*, the Supreme Court held that under certain narrowly-defined

21

circumstances a defendant may attack a facially-sufficient search warrant affidavit. The *Franks* court recognized a strong "presumption of validity with respect to the affidavit supporting the search warrant," *id.* at 171, and thus created a rule of "limited scope." *Id.* at 167. The rule from *Franks* requires a dual showing be made by a defendant which includes both a subjective and objective threshold. *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990). In order to obtain an evidentiary hearing on the integrity of the affidavit, a defendant must first make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155–56. A defendant's showing "must be more than conclusory" and must be accompanied by a detailed offer of proof. *Id.* at 171. A defendant's burden is not only to point out specifically the portion of the search warrant affidavit claimed to be false and provide reasons for the falsity, but a defendant must furnish "'[a]ffidavits or sworn or otherwise reliable statements of witnesses' or explain their absence." *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008) (quoting *Franks*, 438 U.S. at 171). The burden of making the necessary showing is a heavy one and allegations of "negligence or innocent mistake are insufficient." *Id.* (quoting *Franks*, 438 U.S. at 171) (internal quotation marks omitted). Second, the false information must be essential to the court's determination of probable cause; in other words, "'if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required.'" *Colkley*, 899 F.2d at 300 (quoting *Franks*, 438 U.S. at 171–72); *see United States v. Friedemann*, 210 F.3d 227, 229 (4th Cir. 2000) ("*Franks* thus serves to prevent the admission of evidence obtained pursuant to warrants that were issued only because the issuing magistrate was

22

misled into believing that there existed probable cause.").

When relying on omitted facts from a search warrant affidavit to show its deceptiveness rather than an affirmative false statement, a defendant faces an even greater burden. *United States v. Clenney*, 631 F.3d 658, 664 (4th Cir. 2011); *Tate*, 524 F.3d at 454–55 (citing *Colkley*, 899 F.2d at 301). Indeed, the Fourth Circuit has recognized that an affidavit drafted by non-lawyers submitted in support of a search warrant application "'cannot be expected to include . . . every piece of information gathered in the course of an investigation.'" *Tate*, 524 F.3d at 455 (quoting *Colkley*, 899 F.2d at 300). Moreover, "because every piece of information cannot be expected to be included, the very process of selecting facts to include for the demonstration of probable cause must also be a deliberate process of omitting pieces of information." *Id.* "Certainly, such intentional omissions do not satisfy the requirement of *Franks*." *Id.*; *see also Colkley*, 899 F.2d at 300–01 (finding that a showing of intentional omission is not enough to merit a *Franks* hearing; rather, a defendant must show the omission was designed to mislead or was made with reckless disregard of whether it had a misleading effect); *Clenney*, 631 F.3d at 664 (finding that merely identifying factual omissions from a warrant affidavit is not sufficient). Likewise, the information omitted from the warrant affidavit must be material. *See Colkley*, 899 F.2d at 301 ("[T]o be material under *Franks*, an omission must do more than potentially affect the probable cause determination: it must be 'necessary to the finding of probable cause.'") (quoting *Franks*, 438 U.S. at 156). "Omitted information that is potentially relevant but not dispositive [of probable cause] is not enough to warrant a *Franks* hearing." *Id.* In order to prevail at the *Franks* hearing, the defendant must prove these points by a preponderance of the evidence. *Clenney*, 631 F.3d at 664 (citing *Franks*, 438 U.S. at 155-56).

23

Having allowed Defendants' uncontested motion for a Franks hearing, Defendants must show it is more likely than not that the search warrant contained materially false information or omitted facts in order to mislead the magistrate is issuing the warrant. In this regard, Defendants argue the search warrant affidavit contains materially false information. In particular, Defendants argue: (1) Harrell did not tell the police there was stolen property located in 217 Sarah Lane; (2) Harrell was certain that none of the items he saw in the residence belonged either to Crusader or another rental agency; (3) Harrell did not tell police he saw nine large-screen televisions, computers or gaming systems in the residence at 217 Sarah Lane; and (4) Ball omitted from the affidavit that Harrell told police that he had permission to enter the residence and that he would be retrieving the Crusader washer and dryer the following day. Defs.' Mem. at 12-13; Defs.' Supp. Mem. at 2. Defendants also point out that the search warrant affidavit omits the zip code corresponding to 217 Sarah Lane and that the affidavit otherwise fails to inform the magistrate that the police do not have jurisdiction to execute a search warrant outside Henderson city limits. Defs.' Mem. at 15.

The strength of Defendants' argument relies in part on the credibility of Harrell's testimony. To that end, Defendants argue Harrell's credibility is bolstered by the fact that no reportedly stolen items were in fact seized at the residence and the fact that Vaughn testified that the retrieval of rental property was a civil matter not involving the police. Defs.' Supp. Mem. at 2-3. According to Defendants, it is simply unbelievable that Harrell (a crime victim) would enlist the support of the police only to interfere with the execution of police efforts to retrieve the property. *Id.* at 4. Defendants argue further that Ball is not credible because (1) Ball admittedly falsified the search warrant inventory, (2) Ball failed to inquire with Officer Ragland, a member

24

of law enforcement executing the search warrant, if he knew the Raglands,[19] (3) it is simply not believable that Ball was unable to locate Hicks who was incarcerated, and (4) Ball's notes from his investigation were not disclosed to counsel. *Id.* at 5-6 n.2.

The adoption of Harrell's version of events however would fail to reconcile several inconsistencies in the record. First, Harrell insists he did not initiate contact with the police regarding the property rented by Robert Hicks from Crusader. Such a position is highly implausible given the police would have had no reason to approach Harrell in the first place without Harrell having first contacted the police regarding Crusader's property.[20] Moreover, the fact that the search warrant affidavit contains the serial numbers of the washer and dryer corroborates the testimony of Vaughn and Ball that Harrell sought out police assistance in recovering Crusader's property. Second, Harrell's description of his search of 217 Sarah Lane with the Vance County Deputy conflicts materially with Campbell's testimony as to the date and what actually transpired. Campbell's version of events appears to be supported by the sheriff's computer-generated Call Detail Report showing the escort to the residence on May 13, 2008. Indeed, Harrell admits that Campbell's version may in fact be accurate. Hr'g Tr. p. 225. Finally, Harrell testified that on May 14, 2008, he returned to Crusader between approximately 10:30 and 11 a.m., after having retrieved the washer and dryer from the residence, yet Harrell told Waters that the police arrived at 217 Sarah Lane as he was leaving with the washer and dryer. The latter version is corroborated by Lawanda Ragland, who told police Harrell had left the residence five

---

[19]   Ball testified he believed Officer Ragland and Lawanda Ragland were cousins. Hr'g Tr. pp. 158-59.

[20]   While Waters testified Harrell told him the police said they were investigating someone else, it is not clear who this person is or what directed them to Harrell.

25

minutes before the execution of the search warrant. Harrell's version of events is implausible considering the search warrant was executed at 12:40 p.m. Ultimately however, Harrell admits he is unsure of the dates and sequence of events in parts of his testimony. Harrell's inconsistencies and lack of certainty undercuts his overall credibility. The court finds Harrell is simply mistaken, testifying from his memory to events which occurred over four years ago, and without the aid of corroborative documentation.

On the other hand, the court finds the testimony of Ball to be credible and corroborated by documentation as well as consistent with the testimony of Campbell and Vaughn. The grounds asserted by Defendants challenging Ball fail to undermine his credibility. First, the impact of Ball's falsification of the search warrant inventory is muted by the testimony that it was his practice to return stolen property if the victim could be identified. This position is believable in this case given Ball's knowledge of Harrell's keen interest in the return of Crusader's property. Next, Ball's failure to inquire with Officer Ragland whether he was related to the individuals with the same last name who resided in the target residence fails to impact Ball's credibility, especially in light of Ball's testimony that it was only after the investigation that he learned there was a familial relationship to some degree. Hr'g Tr. p. 159. That Ball decided not to inquire as to Officer Ragland's familiarity with the occupants of the target residence speaks more to Ball's overall focused reliance on the information provided by Harrell. Next, Defendants appear to assert that Ball's focus on Defendants was misplaced, and that he should have been attempting to locate Robert Hicks. Ball testified however, that he was not successful in locating Hicks and was not aware that Hicks was incarcerated with the North Carolina Department of Corrections. Hr'g Tr. pp. 135-36. Defendants argue simply that Ball's

26

assertion is not believable because he is a member of law enforcement. The court does not find Defendants' argument convincing. Finally, Defendants assert that Ball suggested in his testimony that he failed to produce his handwritten investigative notes in conjunction with the prosecution of the state firearm charges against Davis arising from the search of Sarah Lane because to do so would have interfered with a federal investigation. The state charges against Davis have subsequently been dismissed, but Defendants point out that Ball's offered rationale is "mysterious." While Ball stated that he would not interfere with a federal investigation, Ball testified he is uncertain whether his handwritten notes were provided to the Vance County District Attorney's office. Hr'g Tr. pp. 138-40. Waters, Davis' attorney for the state case, received Ball's typed notes in discovery but not the handwritten notes, and does not know whether his handwritten notes were provided to the district attorney. Hr'g Tr. pp. 269-71, 274. The status of the handwritten note is not conclusive and the impact on Ball's overall credibility is attenuated.

As further evidence of falsity within the search warrant affidavit, Defendants contend the search warrant fails to inform the magistrate that the police do not have jurisdiction to execute the search warrant because 217 Sarah Lane is located outside the Henderson city limits. Defs.' Mem. at 15. Defendants assert Ball purposefully omitted the zip code corresponding to the address from the search warrant affidavit to ensure the magistrate would not be alerted that the search would occur at a residence outside the city limits. *Id.* at 15-16. While Ball testified that he is not certain of the location of 217 Sarah Lane with respect to the city limits but that it is "between less than two miles" from the city limits, no evidence has been presented to the court

27

definitively locating 217 Sarah Lane in proximity to the Henderson city limits.[21] Moreover, there appears to be a genuine debate within law enforcement and the legal community within Vance County regarding the extent of police extraterritorial jurisdiction to execute search warrants outside the Henderson city limits. The City Attorney and other esteemed local counsel take opposing views on the authority of Henderson police officers to execute search warrants outside the city limits based upon the city charter. It appears to this court the difference of opinion on police authority is pervasive and long-standing. The court therefore cannot conclude that Ball's failure to indicate to the magistrate the location of the residence or its zip code on the search warrant is the result of a design to mislead the magistrate or an utter and reckless disregard for the truth.

Based on the foregoing, Defendants have failed to show by a preponderance of the evidence that Ball knowingly and intentionally, or with reckless disregard for the truth, included false statements in the search warrant affidavit. The court finds further that Defendants have failed to demonstrate omissions of fact were designed to mislead the magistrate into issuing the search warrant or made with reckless disregard.

B.    Probable Cause

A warrant is constitutionally sound when issued by a neutral magistrate and supported by

---

[21]    Unmentioned by the parties is the one-mile area outside the city limits where police have jurisdiction by statute. *See, e.g., State v. Treants*, 298 S.E.2d 438, 438-39 (N.C. App. 1982) (recognizing that municipal police officer has extraterritorial jurisdiction to execute search warrant within one mile outside the city limits in accordance with N.C. Gen. Stat. § 160A-286); *see also* N.C. Gen. Stat. § 160A-286 ("In addition to their authority within the corporate limits, city policemen shall have all the powers invested in law-enforcement officers by statute or common law within one mile of the corporate limits of the city . . . ."). No evidence was presented placing 217 Sarah Lane within this one-mile area.

probable cause." *United States v. Montieth*, 662 F.3d 660, 664 (4th Cir. 2011) (citing U.S. Const. amend. IV and *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)). The probable cause standard is not defined by "bright lines and rigid boundaries." *United States v. Williams*, 974 F.2d 480, 481 (4th Cir. 1992). Rather, probable cause is a "fluid concept" allowing a magistrate to review the facts and circumstances as a whole and make a common-sense determination of whether "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 232, 238 (1983). Facts establishing probable cause need only "'warrant a man of reasonable caution'" to believe that evidence of a crime will be found and do not require a "showing that such a belief be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)); *United States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005). Sufficient information must be presented to the magistrate to allow for the exercise of independent judgment; the magistrate cannot simply ratify the conclusions of others. *Gates*, 462 U.S. at 239. When reviewing the probable cause supporting the search warrant, a reviewing court must consider only the information presented to the magistrate who issued the warrant. *United States v. Wilhelm*, 80 F.3d 116, 118 (4th Cir.1996).

In the Fourth Circuit, "[i]t is well settled that probable cause may be founded upon hearsay and information received from informants," but there is no bright line rule when such tips will establish probable cause. *United States v. DeQuasie*, 373 F.3d 509, 518 (4th Cir. 2004). "In assessing whether an officer acting on an informant's tip has probable cause, [the court] look[s] to the 'totality of the circumstances' surrounding the information available to the officer." *United States v. Miller*, 925 F.2d 695, 698 (citing *Gates*, 462 U.S. 213). Thus, it is important

29

that a magistrate review the "veracity" and "basis of knowledge" of those persons providing hearsay information. *Gates*, 462 U.S. at 238. Additionally, "[t]he Fourth Circuit has explained that in evaluating whether an informant's tip establishes probable cause, the degree to which the report is corroborated is an important consideration." *Wilhelm*, 80 F.3d at 119 (citing *United States v. Lalor*, 996 F.2d 1578, 1581) (4th Cir. 1993)); *Miller*, 925 F.2d at 698 ("An informant's tip is rarely adequate on its own to support a finding of probable cause."). However, there is no requirement that the police corroborate a tip in some specific way, such as conducting an investigation, because such a rigid requirement would be contrary to the "totality of circumstances" approach in determining probable cause. *Miller*, 925 F.2d at 699-700 (finding indicia of reliability in informant's tip established through informant's interest in obtaining leniency by supplying accurate information, officer's knowledge of defendant's criminal past and officer's personal observation of the events corroborating much of the tip).

Since probable cause is evaluated through a "totality of circumstances" analysis and based on a person's common sense, great deference is accorded to a magistrate's assessment of the facts before him. *Montieth*, 662 F.3d at 664 (citing *Gates*, 462 U.S. at 230 and *United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990)). The court's review is therefore limited to whether there was a "substantial basis for determining the existence of probable cause." *Id.* (quoting *Gates*, 462 U.S. at 239) (internal quotation marks omitted). The court will not invalidate a search warrant "'by interpreting [an] affidavi[t] in a hypertechnical, rather than commonsense, manner.'" *Lalor*, 996 F.2d at 1581 (quoting *Gates*, 462 U.S. at 236).

In this case, the government argues the search warrant contained sufficient information to support probable cause to believe that there was stolen property and evidence of false pretenses

at 217 Sarah Lane based on Harrell's statements to the police. Gov't's Supp. Resp. at 2-3. The government argues Harrell was a reliable source because he had viewed the interior of 217 Sarah Lane, could confirm the presence of various items, was able to provide detailed information including exact serial numbers on the Crusader rental items, and was not an anonymous informant. *Id.* at 3. Indeed, probable cause does not require absolute certainties and may be established solely through informant information, but the "totality of the circumstances" as presented must establish a fair probability that evidence related to a crime will be found at the premises when searched. *See United States v. Perez*, 393 F.3d 457, 461-62 (4th Cir. 2004). Although Ball spoke with Harrell in person and viewed documents related to his rental business, which included documents relating to Hicks rental application, the affidavit prepared in application for a search warrant was not sufficient to establish probable cause. In fact, the affidavit, in its entirety of three short fact paragraphs, lacks any information establishing the basis of Harrell's knowledge as to fraudulent activities or the identity of stolen property. The affidavit conclusively states that "[Harrell] stated based on his experiences [sic] he believed the items to be stolen" and that he believed there was fraud on the rental application. Def. Hr'g Ex. F; Gov't Hr'g Exs. 30-32. There is no information in the affidavit explaining what "experiences" establish Harrell's reliability in identifying stolen goods or fraudulent rental applications. The affidavit briefly states that Hicks obtained rental property from other businesses in the Henderson area, but no facts are provided as to how this might relate to fraudulent rentals or stolen property. The affidavit also fails to include any facts of which the police might attest to themselves – namely Harrell's rental and investigative documents that police viewed while speaking with Harrell on May 14, 2008.

31

In addition, the police performed no corroboration of the information provided by Harrell, even something as simple as a criminal history search of Defendants. Learning whether either Defendant or Hicks had a criminal history relative to the crimes alleged in the search warrant affidavit, could have been helpful to verify Harrell's reliability. *See Lalor*, 996 F.2d at 1581 ("Lalor's arrest for cocaine possession, just five days before the warrant was issued, is verification of his involvement in drug activity, and in combination with police corroboration of other details in the informants' tips, provides a substantial basis for finding the informants reliable."); *United States v. Bynum*, 293 F.3d 192, 197-98 (4th Cir. 2002) ("An officer's report in his affidavit of the 'target's prior criminal activity or record is clearly material to the probable cause determination.'") (quoting *United States v. Taylor*, 985 F.2d 3, 6 (1st Cir. 1993)). *See, e.g.*, *Wilhelm*, 80 F.3d at 121 (finding that conclusion as to reliability of informant is dubious where it is based on a brief conversation with informant). Though corroboration of informant information is not required, the absence of any corroboration in the instant affidavit is significant because no other information was provided to the magistrate to establish Harrell's reliability.

Here, there are not enough facts in the affidavit to justify an independent finding of probable cause based solely on Harrell's statements. The affidavit fails to include facts supporting Harrell's reliability and there is no indication that the magistrate had any additional information, apart from the affidavit, which might establish probable cause. Perhaps a more thorough and precise affidavit could support a proper probable cause determination, but the form and contents of the instant affidavit alone do not provide a substantial basis for the existence of probable cause. The search warrant is invalid for lack of probable cause.

Generally, the search of private property without a valid search warrant, *i.e.* one not

32

supported by probable cause, violates the Fourth Amendment. *Perez*, 393 F.3d at 460.
Accordingly, any evidence obtained in violation of the Fourth Amendment is likely to be
suppressed in a criminal proceeding pursuant to the exclusionary rule. *Id.*; *DeQuasie*, 373 F.3d
at 519 (stating that the Supreme Court adopted the exclusionary rule even though the Fourth
Amendment does not expressly contain such a provision). The purpose of the exclusionary rule
is to "deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth
Amendment against unreasonable searches and seizures." *DeQuasie*, 373 F.3d at 519 (quoting
*United States v. Calandra*, 414 U.S. 338, 347 (1974)) (internal quotation marks omitted).
However, the Supreme Court also established the good faith exception to the exclusionary rule in
*United States v. Leon*, 468 U.S. 897 (1984), whereby evidence obtained pursuant to a warrant,
even one subsequently invalidated, should not be suppressed so long as the police officer acted in
good faith in executing the warrant. *United States v. McKenzie-Gude*, 671 F.3d 452, 458 (4th
Cir. 2011). Under the good faith exception, evidence obtained from an invalidated search
warrant will not be suppressed if the officers had an objectively reasonable belief in the existence
of probable cause and that the warrant was properly issued. *See Lalor*, 996 F.2d at 1583 (citing
*Leon*, 468 U.S. at 926). Suppression of evidence obtained by an officer acting in good faith does
not achieve the purpose of the exclusionary rule which is deterrence. *Perez*, 393 F.3d at 461.

The good faith exception does not apply in four circumstances: (1) "the magistrate . . .
was misled by information in an affidavit that the affiant knew was false or would have known
was false except for his reckless disregard of the truth; (2) the magistrate acted as a rubber stamp
for the officers and so 'wholly abandoned' his detached and neutral 'judicial role;' (3) an
affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence

33

entirely unreasonable; or (4) a warrant [is] so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Bynum*, 293 F.3d at 195 (quoting *Leon*, 468 U.S. at 923) (internal quotations marks omitted). In evaluating whether there was objective reasonableness in relying upon the warrant under the third circumstance identified in *Leon*, courts are permitted to look outside the affidavit itself to "facts known to the officers but inadvertently not disclosed to the magistrate." *McKenzie-Gude*, 671 F.3d at 459. Courts may look to all circumstances to determine whether an officer's reliance on a warrant was objectively reasonable. *Id.* As such, "the argument that *Leon* 'categorically precludes application of the good faith exception' when the affidavit examined in isolation 'lack[s] sufficient indicia of probable cause" has no merit. *Id.* at 459-60 (quoting *United States v. Legg*, 18 F.3d 240, 243 (4th Cir. 1994)). An officer's reliance on an affidavit lacking probable cause may be reasonable when coupled with other information known to the officer. *See id.* at 460. The fourth circumstance of facial deficiency applies when the warrant fails to particularize the "place to be searched or the things to be seized." *Leon*, 468 U.S. at 923.

Defendants contend that the good faith exception is precluded from saving the search of 217 Sarah Lane because the warrant and police conduct falls within the first, second, and third set of circumstances. Defs.' Supp. Mem. at 16-18. This court disagrees.

Based upon the previous *Franks* discussion, the first circumstance is not applicable here as the court finds that Ball did not knowingly and intentionally or with reckless disregard for the truth include false statements in the search warrant affidavit. The second circumstance is not applicable either as there is no indication that the magistrate departed from his judicial role. The fact that the court finds the affidavit was not sufficient to support probable cause for a warrant

34

does not imply the magistrate simply acted as a "rubber stamp" for law enforcement. *See Wilhelm*, 80 F.3d at 121-23 (finding that the magistrate was "rubber-stamping" where the informant was anonymous, provided only conclusory descriptions without any specifics and provided general information that anyone in the public could provide). Here, Harrell was not anonymous and he provided law enforcement with information about the contents of 217 Sarah Lane which was not information observable to the general public. When considering the third circumstance under which the good faith exception will not apply, the court looks not only to what was included in the affidavit, but what information Ball knew independently of the affidavit to make his reliance objectively reasonable. *See McKenzie-Gude*, 671 F.3d at 459. Here, the affidavit still contained brief facts of what Harrell directly observed inside 217 Sarah Lane, information Harrell had discovered about businesses and contacts listed on the rental documents, and recognition that Harrell spoke with Ball in person. As discussed, the affidavit alone did not establish probable cause, but it was not so deficient to preclude reasonable reliance by Ball when combined with information Ball knew extrinsic to the affidavit. Separate from the affidavit, Ball met with Harrell in person providing him an opportunity to assess Harrell's credibility and review documentation prepared by Harrell in his own investigation surrounding the whereabouts of Crusader property. Ball reviewed the rental documents which Harrell had used to locate the Crusader property and to confirm addresses and identities contained in the documents. Additionally, Ball reviewed documents from other rental companies advising against renting to Hicks. Taken together, the affidavit and Ball's own knowledge, Ball had sufficient information to reasonably rely on the issued warrant. Lastly, the fourth circumstance under which the good faith exception will not apply, though not argued by Defendants, is not applicable. As discussed

35

in the next section, the warrant does not lack particularity to preclude the good faith exception.

C.     Particularity of the Search Warrant

Defendants further argue that blanket suppression is required because the search warrant lacks particularity. Defs.' Supp. Mem. at 12.

In order to be valid under the Fourth Amendment, a search warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." *United States v. Robinson*, 275 F.3d 371, 381 (4th Cir. 2001) (internal quotations marks and citations omitted). The particularity requirement is intended to limit officer discretion as to what items can be properly seized under the warrant and thus, protect against "general, exploratory rummaging in a person's belongings." *Id.* (quoting *Andresen v. Maryland*, 427 U.S. 463, 480 (1976)) (internal quotation marks omitted). Particularity ensures that the search is "confined in scope to . . . evidence relating to a specific crime for which there is probable cause." *United States v. Oloyede*, 982 F.2d 133, 138 (4th Cir. 1993). "[T]he degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and the type of items involved . . . [so] (t)here is a *practical margin of flexibility* permitted by the constitutional requirement for particularity in the description of items to be seized." *United States v. Torch*, 609 F.2d 1088, 1090 (4th Cir. 1979) (emphasis added) (internal quotation marks and citations omitted) (recognizing that when an alleged offense concerns written materials and documents a warrant may not be able to state with as much particularity which documents or items will be relevant for purposes of the search so less particularity is required for these warrants). In *Torch*, the court held that a warrant for "records, documents and writings related to the transportation, sale, and distribution in interstate commerce of lewd, lascivious and filthy

36

films" was sufficiently particular. *Id.* at 1089-90; *see also Andresen*, 427 U.S. at 479 (holding

that the phrase "together with other fruits, instrumentalities and evidence of crime at this (time)

unknown" was particular enough language because it tied the search to the listed crime for which

there was probable cause); *United States v. Phillips*, 588 F.3d 218, 225 (4th Cir. 2009) ("Indeed,

especially in cases such as this one – involving complex crime schemes, with interwoven frauds

– courts have routinely upheld the seizure of items described under a warrant's broad and

inclusive language.").

In this case, the search warrant specified the following categories of items to be searched

for:

**Section 2     Person or Property to be Seized**

. . . latent prints; Crosley Washer (SN: XC74310646); Crosley Dryer (SN:
XD74311353); documentation related to the control of 217 Sarah Lane;
documents related to fraudulent activities; photographs; any other stolen property;
any and all evidence that may relate to the possession of stolen property from
Crusader Rent to Own, 120 Raleigh Rd Henderson, NC, which constitutes
*evidence of the crime of Possession of Stolen Property and Obtain Property by
False Pretense, which in violation of N.C.G.S. 14-71.1 and N.C.G.S. 14-100*, and
the identity of the person, or persons, participating in this crime, or crimes.

Def. Hr'g Ex. F; Gov't Hr'g Exs. 30-32 (emphasis added).

Review of the warrant persuades the court that the warrant described with sufficient

particularity the items to be seized without authorizing a general search of the premises. Viewing

the warrant language against the "practical margin of flexibility" standard described above, this

case falls within those confines. Indeed, the warrant is not a precise itemized list of items to be

seized, but it does list two North Carolina crimes, evidence of which officers were searching for,

those being (1) possession of stolen property and (2) obtaining property by false pretenses. The

37

listing of crimes directs officers to search only for items that may have a direct connection to the alleged crimes. First, the crime of possession of stolen property deals with specific items which may have been rented by Crusader or other rental businesses. Second, the crime of obtaining property by false pretenses falls neatly within the group of offenses involving a fraudulent scheme whereby the evidence is in the form of documentation. Officers are not looking for single, identifiable objects such as drugs or a gun, but potentially multiple documents that, when taken together, frame up the existence of a fraudulent scheme. Inherently, evidence of fraudulent schemes is less susceptible to precise definition because officers cannot predict in advance what may be relevant for seizure before seeing the document once on the premises. *See Phillips*, 588 F.3d at 225-26. The warrant must provide officers with a degree of flexibility in determining the documents related to the alleged transactions. Here, the officers were looking for evidence of false pretenses which necessarily deals with personal and business identities, credit information and address locations. The North Carolina General Statutes define the crime as "means of any kind of false pretense whatsoever . . . to obtain or attempt to obtain from any person within the State . . . [any] other thing of value with intent to cheat or defraud" which implies that this crime could be effectuated through multiple tactics. N.C. Gen. Stat. § 14-100. The root of the crime is the attempt to defraud another. The nature of the crime prevents officers from specifying with more particularity precise items that should be listed in the warrant. The language of this warrant directs officers to look for "documents related to fraudulent activities" and "any and all evidence that may relate" to the specified crimes. This sufficiently limits officer discretion from conducting a more general search of the premises. The court believes that this case falls within the "practical margin of flexibility" given the alleged offenses. Accordingly, this warrant does

38

not fail for lack of particularity.

D. Validity of the Warrant Execution

Fourth Amendment protections extend also to the execution of the warrant to prevent officers from "'grossly exceed[ing] the scope of a search warrant in *seizing* property.'" *United States v. Uzenski*, 434 F.3d 690, 706 (4th Cir. 2006) (quoting *United States v. Foster*, 100 F.3d 846, 849-50 (10th Cir. 1996)). When a search is conducted pursuant to a warrant, it is "limited in scope by the terms of the warrant's authorization." *Phillips*, 588 F.3d at 223. However, the terms of the warrant are not to be interpreted in a "hypertechnical" manner. *Robinson*, 275 F.3d at 380. Rather, courts should assess warrants in a realistic manner. *See United States v. Srivastava*, 540 F.3d 277, 298 (4th Cir. 2008). Officers may seize an item pursuant to a warrant even if the item is not expressly mentioned because many times it is "simply impossible for law enforcement officers to know in advance exactly what [] records the defendant maintains or how the case against him will unfold." *Phillips*, 588 F.3d at 225 (recognizing that the facts and circumstances of a each case require officers to have discretion to seize items not expressly listed in the warrant). Courts have repeatedly upheld the "seizure of items described under a warrant's broad and inclusive language," particularly in cases involving a mass collection of records and documents. *Id.*; *Srivastava*, 540 F.3d at 289. Additionally, the fact that crimes other than those described in the warrant surface from the evidence collected does not mean the search was over broad or beyond the scope of the warrant. *Williams*, 592 F.3d at 520 (citing *Phillips*, 588 F.3d at 224); *see also Srivastava*, 540 F.3d at 281-83 (finding the execution of a search warrant valid even though the warrant listed medical billing fraud and evidence of tax fraud was seized). Courts generally refuse to hold that items "reasonably encompassed by the terms of the warrant .

39

.. fall[] outside [the] scope because the item is probative of charges other than those initial charges set forth by the warrant." *Phillips*, 588 F.3d at 224. It is often the case that a "single piece of evidence will be probative of multiple crimes." *Id.*

As a result, "[a] search is not invalidated in its entirety merely because some seized items were not identified in the warrant." *Robinson*, 275 F.3d at 381. Blanket suppression is an "extraordinary remedy" that should only be used in extreme situations where the search devolves into an "impermissible general search." *Id.* at 382; *see also Foster*, 100 F.3d at 850-51 (finding blanket suppression required when law enforcement officers seized "anything of value" even though the warrant only authorized seizure of marijuana and several identified firearms). The general rule is that items properly seized may still be admitted even when some items were improperly seized at the same time. *United States v. Ruhe*, 191 F.3d 376, 383 (4th Cir. 1999).

Defendants argue that the police "did not seize a single item that was authorized by the search warrant – not even one." Defs.' Supp. Mem. at 13. The court finds this assertion to be a bit hyperbolic. Defendants' argument appears to be based on the premise that the only items acceptable for seizure would have been the Crusader washer and dryer or other stolen items as Defendants state "the police wholly abandoned the investigation regarding the Crosley washer and dryer, and instead conducted a general search." *Id.* at 14. Defendants' argument fails to acknowledge the crime of obtaining property by false pretenses and its impact on the authorized seizure of items. The court believes that the large majority of items were properly seized pursuant to the warrant and that blanket suppression is not appropriate.[22]

---

[22] The acceptable places to search for authorized items under a search warrant include any space or container where there is probable cause to believe it will be found. *See United States v. Ross*, 456 U.S. 798, 824 (1982). Defendants do not challenge this aspect of the scope of the search.

40

The text of the warrant as discussed previously authorized a search for evidence relating to the North Carolina crimes of possession of stolen property and obtaining property by false pretenses. The court finds this case analogous to others involving false pretenses or fraud schemes. The court recognizes that officers searched 217 Sarah Lane partly to find evidence of a scheme related to obtaining rental property in the near vicinity of Henderson and were not investigating a case of pervasive and interwoven fraud; however, the principles in those cases allowing for flexible seizure of items are still applicable to the present case based on the nature of the alleged offense.

The language of the warrant was inclusive to allow the officers to seize items that may be evidence in a future criminal prosecution for obtaining property by false pretenses. It is likely that not every item seized will ultimately be probative evidence, but the nature of the offense of false pretenses precludes officers from making an on-the-spot determination of each item's significance. Officers, operating under time and knowledge constraints, cannot be expected to distinguish what items were and were not related to Hicks' alleged false pretenses offense. *See Phillips*, 588 F.3d at 227. It would require experts to determine what crimes those seized items would ultimately piece together. This does not stand for the proposition that officers had the freedom to take what they like, but that is not what happened here. The officers took items they reasonably believed fell within the scope of the warrant's authorization – namely documents and papers evidencing false pretenses. Of the 369 items seized and inventoried, the court breaks down the itemized inventory list as follows:

41

(1) Items within the search warrant's scope: 1, 4-15, 17-36, 38-147, 149-173, 175-369.[23]

(2) Items NOT within the search warrant's scope: 2-3, 16, 37, 148, 174.[24]

*See* Gov't Hr'g Exs. 1-23.

The items properly seized under the warrant total 363. Those items consist of checks, stolen mail, social security cards, blank checks, credit card statements, billing statements, earnings statements, other assorted documents, male clothing, containers in which documents were found, computer electronics, printers, scanners, and computer accessories. These items were reasonably encompassed by the warrant since officers were looking for evidence of false pretenses and stolen property. The items that appear to be improperly seized under the warrant include a rifle, ammunition, earphones, a DVD titled Van Highlights, and a silver shoe box. These items merit suppression.[25]

The warrant sufficiently authorized the seizure of the majority of the contested evidence here, even though the items were not specifically listed in the warrant. The officers acted reasonably in their seizure of evidence and the fact that some items were outside the warrant did

---

[23]   The court notes that the Defendant Davis gave consent to search the briefcase. Hr'g Tr. pp. 84-85.

[24]   Additionally, the plain view exception does not apply to items outside the scope of the warrant, particularly the rifle and ammunition because the criminal character of these items was not immediately apparent to officers as required by the plain view exception. *United States v. Wells*, 98 F.3d 808, 809-10 (4th Cir. 1996). The facts indicate that the officers, even Ball who lead the search of 217 Sarah Lane, did not have prior knowledge of Davis' felony conviction. Hr'g Tr. pp. 82-83. Without knowledge, prior to the search, that Davis was a felon, the incriminating nature of the rifle is not immediately apparent. *See Wells*, 98 F.3d at 810. Further, the underlying crimes in the search warrant are not drug crimes or crimes of violence to make the incriminating nature of the rifle immediately apparent. *Id.*

[25]   Though Defendants have only argued for blanket suppression and not argued for suppression of specific items, the court finds these items merit suppression nonetheless.

not transform this into a fishing expedition. Additionally, the fact that the seized items led to the prosecution of crimes different from those specified in the warrant is of no significance. Accordingly, blanket suppression is not appropriate.

The court finds that blanket suppression of the evidence is not warranted under *Franks* principles. Additionally, blanket suppression is not warranted for lack of probable cause, lack of particularity, or improper execution of the warrant. Suppression is only granted as to the few items listed which fall outside the scope of the search warrant.

## CONCLUSION

For the reasons set forth above, it is the recommendation of this court that Defendants' Joint Motion to Suppress [DE-36] be DENIED in part, ALLOWED in part.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and Recommendation. Additionally, except upon grounds of plain error, failure to timely file written objections shall bar a party from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

Submitted, the 16th day of November, 2012.

Robert Jones Jr.

Robert B. Jones, Jr.
United States Magistrate Judge

43